**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL SECURITY ARCHIVE,

    2130 H Street, N.W., Suite 701
    The Gelman Library
    Washington, DC 20037

      *Plaintiff*,

    *v.*

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,

    8601 Adelphi Road,
    College Park, MD 20740-6001

      *Defendant.*

Civil Action No. 1:24-cv-03300

**COMPLAINT**

**INTRODUCTION**

1.      During the eight years of his presidency, former President George W. Bush met with Vladimir Vladimirovich Putin, President of the Russian Federation (and formerly its Prime Minister), on at least 19 different occasions, and had 73 calls with the Russian leader.

2.      Despite the fact that President Bush left office some 15 years ago, the American public still knows very little, if anything, about what was said in private between these two world leaders during the eight years of the George W. Bush presidency.

3.      Knowing what was said during these discussions is crucial to shaping the public's understanding of U.S.-Russia relations from 2001 through the present day.

4.      The records of President Bush's meetings and phone conversations with Mr. Putin remain unavailable to the public.

5.      On November 14, 2023, in an effort to shine a light on this period in the development of our Nation's foreign policy, the National Security Archive ("Archive") submitted a Freedom of Information Act ("FOIA") request for the release of records relating to President Bush's exchanges with Mr. Putin with the George W. Bush Presidential Library and Museum ("Library"), which is part of the National Archives and Records Administration ("NARA").

6.      More than seven months after the Archive submitted this request, the Library informed the Archive that, because "there are 673 requests ahead of yours in the queue," its "best estimate" for the processing of the Archive's request would be "approximately 12 years."

7.      The reasons for NARA's stonewalling are obvious:  it has too many records to process in the ordinary course—never mind FOIA requests—and not enough funding.  As a result, FOIA requests like the one submitted by the Archive have fallen by the wayside.

8.      Under the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. § 2201 *et seq.*, presidential records are subject to public disclosure in accordance with FOIA five years after the end of a president's term in office.  While the PRA allows a former president to restrict access to such records even after that time—including for reasons relating to national security—the PRA terminates the ability to restrict access 12 years after the end of the former president's term in office.  President Bush's 12-year period ended in January 2021.

9.      NARA has shirked the requirements of the PRA and FOIA by telling the Archive that it must wait until 2036 at the earliest—when President Bush would be 90 years old—before the Archive can obtain President Bush's records from 2001 to 2008.

10.     Neither the PRA nor FOIA permits NARA to wait this long before processing the requested records.  Like any other member of the public, the Archive is entitled to obtain these historical records from the Library.  By forcing the Archive to wait at least 27 years for these documents, NARA, through the Library, has deprived the Archive of the right to access enshrined in FOIA.

11.     Under FOIA, agencies like NARA have 20 business days to "determine … whether to comply with" a FOIA request, and they are obligated to "immediately notify the" requester of its "determination and the reasons therefor," as well as the requester's right to appeal an "adverse determination."  5 U.S.C. § 552(a)(6)(A)(i)(I).  Even under "unusual circumstances," an agency may extend the response period only by 10 additional business days.  5 U.S.C. § 552(a)(6)(B)(i).

12.     Almost a year has passed since the Archive's November 2023 FOIA request, yet NARA has failed to provide even a "determination."  NARA's responses to date have not been "determinations," because NARA has not identified the documents that it plans on producing, and the exemptions that it plans on asserting with respect to documents withheld.

13.     NARA has failed its duty under FOIA to "make … records promptly available."  5 U.S.C. § 552(a)(3)(A).  This Court should exercise its authority under 5 U.S.C. § 552(a)(4)(B) to enjoin NARA from improperly withholding the records of President Bush's exchanges with Mr. Putin, and to order their production.

### JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B), 552(a)(6)(E)(iii) and 28 U.S.C. § 1331.

15.     Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e)(1)(C).

### PARTIES

16.     Plaintiff National Security Archive ("Archive") is an independent non-governmental research institute and library.  The Archive was established in 1985 to promote evidence-based research and public education about the U.S. governmental and national security decision-making process.  It collects, analyzes, and publishes documents acquired through FOIA in order to promote and encourage openness and government accountability.  The Archive serves as a repository of government records on a wide range of topics pertaining to the national security, foreign, intelligence, and economic policies of the United States.  The Archive is a representative of the news media within the meaning of 5 U.S.C. § 552(a)(4)(A)(ii).  *See Nat'l Sec. Archive v. U.S. Dep't of Defense*, 880 F.2d 1381 (D.C. Cir. 1989), *cert denied*, 110 S. Ct. 1478 (1990).  The Archive is located in Washington, D.C.

17.     Defendant NARA is an independent agency of the United States government within the executive branch, and is responsible for preserving and documenting government and historical records.  NARA is also responsible for increasing public access to these documents.  NARA is an

"agency" within the meaning of 5 U.S.C. § 552(f)(1) and is headquartered in College Park, Maryland.

## BACKGROUND

### "One Cold Dude":  U.S.-Russia Relations During the George W. Bush Presidency

18.     Prior to taking office on January 20, 2001, George W. Bush reportedly described Vladimir Vladimirovich Putin, then the President of the Russian Federation, as "one cold dude."[1]

19.     The two met for the first time on June 16, 2001 at Brdo Castle in Slovenia, the main protocol building of the Slovenian government.  According to President Bush, the only attendees at the meeting were himself, Mr. Putin, Condoleezza Rice (who, at the time, was President Bush's National Security Advisor), Vladimir Rushailo (then-Secretary of the Security Council of the Russian Federation), and two interpreters.

20.     In the Kremlin's readout of the "restricted-attendance talks," the Russian government reported that the two leaders spoke about "the strengthening of strategic stability and the U.S. initiative to create a national missile defence system," "regional problems in the Balkans, Nagorny Karabakh and Afghanistan," and "energy resources in the Caspian basin."  *See* **Exhibit A.**

21.     Neither the U.S. State Department nor the George W. Bush White House ever provided a public readout of the "restricted-attendance talks."

22.     Some 22 years after the meeting, President Bush offered his recollection of what happened at Brdo Castle.  President Bush remarked that he "wanted to get to know the guy [Mr. Putin]" during the meeting, because he believed "the best kind of diplomacy is personal

---

[1] Peter Baker, *3 Presidents and a Riddle Named Putin*, N.Y. Times (Mar. 23, 2014), https://www.nytimes.com/2014/03/24/world/europe/3-presidents-and-a-riddle-named-putin.html ("Mr. Bush came to office skeptical of Mr. Putin, privately calling him 'one cold dude,' . . . .").

diplomacy." According to President Bush, Mr. Putin's "whole countenance changed," going from "tense to relaxed," when President Bush mentioned a cross blessed in Jerusalem that Mr. Putin's mother had given to her son. The conversation then shifted to the topics of Mr. Putin's "mother, and the cross, and what it meant to him," and Mr. Putin's daughters. That personal conversation, President Bush reflected, helped to "establish a really good rapport" that allowed them to "begin a working relationship." Victor Pinchuk Foundation, *A Conversation with George W. Bush: Ukraine and NATO: Looking Back to 2008 and to the Future*, YouTube (Sept. 10, 2023), https://www.youtube.com/watch?v=2954AVJr5pI ("Pinchuk Foundation Video").

23. After the meeting, the two leaders held a joint press conference, during which President Bush famously said about Mr. Putin: "I looked the man in the eye. I found him to be very straightforward and trustworthy. We had a very good dialogue. I was able to get a sense of his soul; a man deeply committed to his country and the best interests of his country." The White House (President George W. Bush), *Press Conference by President Bush and Russian Federation President Putin* (June 16, 2001, 5:30 pm), https://georgewbush-whitehouse.archives.gov/news/releases/2001/06/20010618.html.

24. Since the Brdo Castle meeting, President Bush met with Mr. Putin on at least 18 other occasions during his presidency. *See* **Exhibit B** (identifying the dates and locations of the meetings). And in the eight years of his time in office, President Bush spoke with Mr. Putin at least 73 times on the phone. *See id*.

25. Every meeting between the two leaders would have generated a "memcon," shorthand for "memorandum of conversation." A memcon is a "written record of face-to-face meetings between the President or Vice President and heads of state or foreign officials." Clinton Digital Library, *Memcons & Telcons*, https://clinton.presidentiallibraries.us/memcons-telcons.

6

And every telephone conversation between the two leaders would have generated a "telcon," or "memorandum of telephone conversation," which provide a "written record of those meetings which occur by phone." *Id.* Memcons and telcons of former Presidents are typically made available to the public some time after the President leaves office. For example, the memcons and telcons of President Clinton's conversations with President Boris Yeltsin are available through President Clinton's presidential library. *Id.*

26. For a president for whom "personal diplomacy" was "the best kind of diplomacy," the personal relationship between the President of the United States and the leader of the Russian Federation soured in the eight years between January 2001 and January 2009. In 2006, President Bush reportedly remarked to the premier of Slovenia: "He's a tsar. I think we've lost him." Peter Baker, *The Seduction of George W. Bush*, Foreign Policy (Nov. 6, 2013), https://foreignpolicy.com/2013/11/06/the-seduction-of-george-w-bush/. On a separate occasion, President Bush reportedly confided to Tony Blair, Prime Minister of the United Kingdom: "There was no breakthrough with this guy [Mr. Putin]." *Id.* And when the two sat near each other at the opening ceremony for the 2008 Beijing Summer Olympics, while tensions brewed between the Russian Federation and the Republic of Georgia, President Bush reportedly told Mr. Putin: "You're cold-blooded." *Id.*

27. By the end of his administration, President Bush had a different view of Mr. Putin's soul. To quote the former President: "Had I looked in his eyes at the end of my presidency, I would have seen a different soul. In my judgment, it darkened up. He became infected with power, money, and perhaps sex. And he's a different guy." *See* Pinchuk Foundation Video.

**NARA Tells the National Security Archive that Records of the Bush-Putin Exchanges Will Not Be Available Until 2036, 27 Years After President Bush Left Office**

28.     The National Security Archive ("Archive") has researched and reported on the relationships between Russian and American leaders as part of its broader look at the evolution of U.S.-Russia foreign policy.  For example, in 2020, the Archive published numerous declassified Soviet and American documents that detailed, among other things, exchanges between President George H.W. Bush and President of the Soviet Union Mikhail Gorbachev regarding Iraqi aggression against Kuwait.  National Security Archive, *Inside the Gorbachev-Bush "Partnership" on the First Gulf War 1990*, https://nsarchive.gwu.edu/briefing-book/russia-programs/2020-09-09/inside-gorbachev-bush-partnership-first-gulf-war-1990.  The Archive has also published *The Last Superpower Summits:  Gorbachev, Reagan, and Bush*, an  award-winning book that published and analyzed memcons from the summits between President Reagan and General Secretary Gorbachev, and the summits between President George H.W. Bush and President Gorbachev.  The Archive also published and analyzed memcons of the meetings between President Clinton and Mr. Putin in *Putin, Clinton, and Presidential Transitions*, a briefing book that "document[s] Putin's rise to power" using "verbatim Clinton-Putin and Clinton-Yeltsin conversations."   Nat'l Sec. Archive, *Putin, Clinton, and Presidential Transitions*, https://nsarchive.gwu.edu/briefing-book/russia-programs/2020-11-02/putin-clinton-transitions.

29.     As part of this work, the Archive has been researching the relationship between President Bush and Mr. Putin.  The Archive used records obtained from the Library and from the Kremlin's website to establish the dates of each and every documented conversation between the two leaders.

30.    Obtaining the memcons and the telcons of the meetings and exchanges between the two leaders is critical for understanding this relationship, particularly for an American president for whom "the best kind of diplomacy is personal diplomacy."

31.    Those memcons and telcons have not been publicly released, either by the National Archives and Records Administration ("NARA"), or by the George W. Bush Presidential Library and Museum ("Library").  The memcons and telcons are currently in the possession of NARA.

32.    On November 14, 2023, Dr. Svetlana Savranskaya, the Archive's Director of Russia Programs, submitted a request for records under FOIA to NARA ("Putin Request"), requesting "all the records of telephone conversations and memoranda of conversations during meetings between President George W. Bush and Russian President Vladimir Putin."  Specifically, Dr. Savranskaya provided the dates of 73 telcons, and the dates and locations of 19 memcons that she was seeking as part of her request.  **Exhibit B.**

33.    NARA acknowledged the Putin Request on November 29, 2023 ("November 2023 Response"), stating that it was "still running the initial search for potentially responsive classified records," and that the Archive would "hear back from us once that is complete."  *See* **Exhibit C**. The request was given case number NW 78134.

34.    By February 2024, the Archive had heard nothing from NARA about the Putin Request.  So, on February 22, 2024, the Archive asked for a status update.  *See* **Exhibit D**.

35.    It took NARA more than a month to respond.  On April 5, 2024, NARA wrote back to say that it was "still working on getting an estimated completion date" for the Putin Request. *See* **Exhibit E**.

36.    On June 28, 2024, more than seven months after the Archive submitted the Putin Request, NARA provided an estimated completion date for NW 78134:  "approximately 12 years."

**Exhibit F** ("June 2024 Response").  In a letter providing the completion date, NARA explained that the "estimate includes time for NARA to complete the necessary notification to the representatives of the former and incumbent Presidents in order to afford them an opportunity to conduct [an executive] privilege review, as is required by the Presidential Records Act." *Id.*

37.    But the PRA's privilege review period is short:  under Executive Order 13489, "[u]pon the passage of 30 days after receipt by the incumbent and former Presidents of a notice of intent to disclose Presidential records, the Archivist may disclose the records covered by the notice, unless during that time period the Archivist has received a claim of Executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period for a time certain and with reason for the extension of time provided in the notice."[2]

38.    The Archive's Putin Request, NARA explained, "is in the classified Presidential Library holdings queue and there are 673 requests ahead of yours in the queue."  "Our best estimate," NARA stated, "is that it may be completed in approximately 12 years."

39.    Twelve years from the date of the letter is June 28, 2036, more than 27 years after President Bush left office.

40.    To date, NARA has not made a determination on the Archive's Putin Request, nor has it produced any records in response to the Putin Request.

#### The Putin Request is Stuck in NARA's Immense and Impossible Backlog

41.    NARA has not explained to the Archive why it needs 12 years to process the Archive's Putin Request.

---

[2] The White House (President Barack Obama), *Executive Order 13489 – Presidential Records* (Jan. 21, 2009), https://obamawhitehouse.archives.gov/the-press-office/presidential-records.

42.     The cause of NARA's delay in responding to the Putin Request and other similar requests for presidential records is not difficult to discern:  NARA has a massive backlog of records to process—both in performing its routine archival responsibilities, and in responding to FOIA requests.  And it does not have either the funding or a plan to meaningfully address the backlog.

43.     NARA is charged with preserving, curating, and caring for presidential records after a president leaves office.  To quote Deputy Archivist of the United States William J. Bosanko, presidential records "strike[] at the very heart of the historical record, the completeness of it, the ability to understand decisions."  Norah O'Donnell et al., *Deputy Archivist Stresses Importance of Preserving Presidential Records After Trump, Biden Document Investigations*, 60 Minutes Overtime (Sept. 22, 2024, 7:00 p.m.) ("60 Minutes Article"), https://www.cbsnews.com/news/presidential-records-national-archives-60-minutes/.  Presidential records are "important for historians, and ultimately the American people[,] to understand all of the pieces that came in and made up that decision making." *Id.*

44.     Under the PRA, 44 U.S.C. § 2203(g)(1), when the President of the United States leaves office, the Archivist of the United States "assume[s] responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President."

45.     Those records are not immediately available to the public.  Instead, the PRA gives the Archivist five years from the date that the Archivist takes custody to process and organize those records.  44 U.S.C. § 2204(b)(2).

46.     The former President may restrict access to certain enumerated categories of records for a period "not to exceed 12 years" following the conclusion of the President's term of office.  This includes records "specifically authorized under criteria established by an Executive

11

order to be kept secret in the interest of national defense or foreign policy and … in fact properly classified pursuant to such Executive order."  44 U.S.C. § 2204(a)(1).

47.     After the 12 years have run, the PRA's restrictions no longer apply, and members of the public may request the records of the former president under FOIA.

48.     According to Deputy Archivist Bosanko, when the PRA's five-year restriction on a former president's records is up, that creates "a backlog of thousands of FOIA requests that [NARA] can't possibly respond to" within the time allotted under FOIA.

49.     Presidential records often require additional processing because a request may cover classified materials, which must undergo declassification review prior to release under FOIA, as is the case with the records requested as part of the Archive's Putin Request.

50.     Before 2018, each of the presidential libraries was responsible for conducting declassification reviews for FOIA requests received by that library.

51.     In 2018, however, NARA consolidated all declassification reviews for 10 of the presidential libraries, including the Library here, at the National Declassification Center in College Park, Maryland.

52.     That consolidation, combined with the effects of the COVID-19 pandemic, added to NARA's backlog.

53.     As of June 30, 2024, there are 699 FOIA-related declassification requests pending at the seven libraries covered by the National Declassification Center, and 348 FOIA-related declassification requests pending at the Nixon, Reagan, and Clinton libraries.  The National Declassification Center and the Nixon, Reagan, and Clinton libraries are also responsible for Mandatory Declassification Requests, a declassification process separate from FOIA that is available under Executive Order 13526.  The Center currently has a backlog of 11,846 requests

for Mandatory Declassification Reviews for the seven presidential libraries covered by the Center; the Nixon, Reagan, and Clinton libraries have a combined 8,115 pending cases for Mandatory Declassification Reviews.   Staff members at the National Declassification Center are often responsible for both FOIA-related declassification reviews and Mandatory Declassification Reviews.

54.    The current Archivist of the United States, Colleen J. Shogan, addressed this backlog with a vague statement about technology:  "I think the way that we are really going to make headway on this in the near future is going to be through technology."  *See* 60 Minutes Article.

55.    But NARA does not have the resources to implement a technology-enabled fix for the backlog.  Despite its "growing workload, [NARA's] staff and budget has been stagnant. Adjusted for inflation, NARA's operating expenses appropriation was $399 million in 2004.  Now, with nearly twice the [record] holdings, it is $427 million."  David E. Hoffman, *A Digital Tsunami is Coming.  The National Archives is in Trouble*, Wash. Post (Sept. 20, 2024, 6:00 am) ("Archives in Trouble"), https://www.washingtonpost.com/opinions/2024/09/20/national-archives-troubles-digital/.

56.     "Twenty years ago, NARA had a full-time equivalent budget for 1,463 people. Today it is 1,596."  *Id.*

57.    A draft NARA statement for National Humanities Advocacy Day 2024, titled "Need to Right-Size NARA," confirms that NARA "is no longer able to fully support its core mission and is at serious risk of major mission failure, due to a decades-long gap between the ever expanding holdings and stagnant (and in some places, reduced) resources."  *See* **Exhibit G**.

58.    The draft statement undermines Dr. Shogan's assertion that technology will be the answer to NARA's presidential records backlog.  Because of NARA's severe budgetary shortfalls, the draft statement asserts that "NARA has not been able to acquire and deploy the most advanced digital tools that are necessary to keep up with the ever accumulating volume of government records that [NARA] receive[s] every year."  Even as to NARA's modest goal of simply digitizing its current analog holdings, the draft statement remarked that NARA was only "just nearing 500 million pages out of the *12 billion pages* we currently have." (emphasis added).

59.    According to the draft statement, the depleted resources have left NARA staff not just "frustrated" at their inability to serve the public, but "increasingly overworked and under-supported, unable to keep up with the ever increasing demand for our national treasures."

## CAUSE OF ACTION

### COUNT I

### *Violation of FOIA: Agency Records Wrongfully Withheld*

60.    The Archive repeats and realleges Paragraphs 1 through 59.

61.    NARA is an "agency" for purposes of 5 U.S.C. § 552(f)(1).  NARA is therefore subject to FOIA.  5 U.S.C. § 552.

62.    NARA has violated FOIA by wrongfully withholding responsive agency records requested by the Archive.  5 U.S.C. § 552(a)(3).

63.    NARA failed to make a "determination," within the meaning of 5 U.S.C. § 522(a)(6), within 20 working days of receiving the Putin Request (or at all).  Neither the November 2023 Response nor the June 2024 Response (collectively, "Responses") indicated that NARA had gathered and reviewed documents responsive to the Archive's Putin Request.  The Responses also did not determine or communicate the scope of the documents that NARA had

intended to produce and withhold, and the reasons for withholding any documents. Nor did they inform the Archive that it can appeal whatever portion of the 'determination' is adverse. *See Citizens for Resp. and Ethics in Wash. (CREW) v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013).

64.    Because NARA has failed to provide a determination within the time prescribed by 5 U.S.C. § 522(a)(6), and has not cured that failure, the Archive has exhausted its administrative remedies with respect to NARA's wrongful withholding of the records requested in the Putin Request.

65.    The Archive is entitled to injunctive relief with respect to the release and disclosure of the requested records.

**PRAYER FOR RELIEF**

WHEREFORE, the Archive respectfully requests that this Court:

1) order NARA to promptly disclose the requested records and make a copy available to the Archive;

2) provide for expeditious proceedings in this action;

3) award the Archive costs and reasonable fees incurred in this action; and

4) grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Andrew Kim

| | |
|---|---|
| Jordan L. Lampo | Andrew Kim (D.C. Bar No. 1029348) |
| (admission pending) | *andrewkim@goodwinlaw.com* |
| GOODWIN PROCTER LLP | Jaime A. Santos (D.C. Bar No. 1047905) |
| The New York Times Building | *jsantos@goodwinlaw.com* |
| 620 Eighth Avenue | Brian T. Burgess (D.C. Bar No. 1020915) |
| New York, NY 10018 | *bburgess@goodwinlaw.com* |
| | GOODWIN PROCTER LLP |
| | 1900 N Street, N.W. |
| | Washington, D.C. 20036 |
| | (202) 346-4000 |

*Counsel for Plaintiff*
*National Security Archive*

November 21, 2024

16